IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SHARON CHERRY FIEGER,**<br>**Plaintiff,** | **CIVIL ACTION** |
| v. | |
| **CLIFFORD HALL and SIGNATURE**<br>**EMERGENCY PRODUCTS, LLC,**<br>**Defendants.** | **NO. 24-2410** |

## MEMORANDUM OPINION

Plaintiff Sharon Cherry Fieger ("Fieger") represented Defendant Clifford Hall ("Hall") and his company, Defendant Signature Emergency Products, LLC ("SEP"), in a lawsuit brought by Hall's former employer. Hall could not afford to make regular monthly payments to cover her legal fees, so, according to Fieger, he agreed to convey to her a 15% equity interest in SEP, which would be transferrable upon her request. But when Fieger eventually made such a demand, Hall feigned ignorance and refused to make good upon his promise.

As a result, Fieger, who is proceeding *pro se*, sued Hall and SEP for breach of contract, fraud, promissory estoppel, and equitable relief—all under Pennsylvania law. Now, Hall and SEP each move to strike certain allegations in Fieger's Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(f). They also move to dismiss the Second Amended Complaint in its entirety pursuant to Rule 12(b)(6). For the reasons that follow, their Motions shall be denied.

### I.    BACKGROUND[1]

In 2002, Hall quit his job in the sales department of Freedom Medical—a company that bought, refurbished, rented, and sold biomedical equipment—to launch Signature Medical Ltd.

---

[1] The following factual recitation is taken from Fieger's Second Amended Complaint, well-pleaded allegations from which are taken as true at this stage. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).

("SML"). Two years later, he teamed up with Thomas Gillespie, one of his former colleagues at Freedom Medical, to start SEP. Both companies directly competed with Freedom Medical for business.

In response, Freedom Medical sued Hall, Hall's wife, Gillespie, SEP, SML, and eighteen other defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. § 1961 *et seq.*, accusing them of stealing equipment, poaching key clients, and diverting lucrative sales opportunities to SEP and SML. In March 2014,[2] Freedom Medical obtained a default judgment against Hall, SEP, and SML in the amount of $324,000, and noticed his deposition in aid of execution on that judgment. Up until that time, Hall, SEP, and SML had been represented by lawyers other than Fieger. But following the default judgment and the notice of deposition, Hall contacted Fieger to see if she would represent him and the companies in the remnants of the RICO matter. During an initial consultation, Hall informed Fieger that Gillespie had since relinquished his interest in SEP, leaving Hall as the sole owner of both SEP and SML. Hall also mentioned that he had limited funds at his disposal, as SML was essentially defunct, and SEP was on the verge of bankruptcy. That said, he was adamant that he intended to grow SEP into a profitable business within the decade, so he proposed paying Fieger $2,500 as a retainer with the goal of "find[ing] a way" to obtain the necessary funds to compensate her for the rest of her time.

Fieger ultimately agreed to represent Hall, SEP, and SML in the RICO case and subsequently devoted her "full-time attention" to the matter over the next three months. In so doing, she successfully moved to set aside the default judgment and stay Hall's deposition. At that point, Hall had only paid her $4,500. Anticipating that her continued representation of Hall

---

[2] The RICO matter, which commenced in 2006, was placed in suspense for several years after both Hall and Gillespie were indicted for crimes in connection with the operation of SEP and SML.

and his companies would take most, if not all, of her time going forward, and growing concerned about her unpaid bills, Fieger approached Hall in July 2014 to revisit the topic of her compensation.  In the course of that discussion, they also talked about "the possibility of instituting a malicious prosecution case against Freedom Medical on behalf of Hall's wife," as well as "the possibility of a walk-away settlement with Freedom Medical or even better, the payment of money to Hall's wife by Freedom Medical and its owners."  Hall also "repeated what he previously told [Fieger] about his limited financial resources" and his goal of building SEP into a profitable venture.

As a result of that conversation, Fieger and Hall executed an undated fee agreement (the "First Fee Agreement"), with Hall signing in his individual capacity and on behalf of SEP and SML.  It states:

> Sharon Cherry (Attorney) has been representing Clifford Hall, Sandra Hall,[3] Signature Medical LLC, and Signature Emergency Products LLC (Client) in the Federal Court action currently pending in the United States District Court for the Eastern District of Pennsylvania (civil action no. 06-3195) since April 1, 2014.  The parties enter into this fee agreement for legal services rendered between April 1, 2014 through June 30, 2014.  Attorney and Client agree that the fee for legal services is $20,000 per month.  The total fee due for the three-month period is $60,000.  If the case is settled and Client receives financial compensation from Plaintiff, Attorney shall be due and owing $60,000 plus an additional 10% of the settlement award if the settlement award is less than $100,000.[4]  If the settlement award is $100,000 or greater, Attorney shall be due and owing $60,000 plus an additional 20% of the settlement award.  If Client receives a settlement award, it is agreed that the settlement check shall be made payable jointly to Attorney and Client and that Attorney will deduct all fees and costs from the settlement amount and pay the balance, if any, to Client.  Client is responsible for all costs.  Client shall receive a credit of $4500 for payments made to date.

---

[3] Contrary to this passing reference in the First Fee Agreement—a document that Sandra Hall (Clifford Hall's wife) did not sign—the Second Amended Complaint elsewhere avers that Hall's wife "obtained her own attorney" to resolve Freedom Medical's claims against her in the RICO matter and was ultimately dismissed therefrom on or about May 23, 2013.

[4] Fieger does not identify who the "Plaintiff" is for purposes of the contingency fee outlined in the First Fee Agreement.  However, the Second Amended Complaint, generously construed, suggests that it is Freedom Medical, who was the plaintiff in the RICO matter and the likely defendant in the malicious prosecution suit, which, at the time, Hall's wife considered filing.

Over the next several months, Fieger continued to represent Hall and his companies to settle the RICO matter. Hall remained strapped for cash, however, so he did not remit any additional payments in furtherance of the First Fee Agreement. And Hall's wife decided against bringing a malicious prosecution case against Freedom Medical, dashing any hopes of "negotiating a settlement . . . that included a payment of money," and by extension, Fieger receiving the contingency fee contemplated in the First Fee Agreement. As a potential workaround to ensure her future compensation, Fieger and Hall toyed with the idea of giving her an ownership interest in SEP. Those discussions ultimately resulted in the execution of a second fee agreement on September 3, 2014 (the "September 2014 Fee Agreement"), which provides:

> The attorney is Sharon Cherry (Attorney). The clients are Clifford Hall and his two companies, Signature Medical Ltd., LLC and Signature Emergency Products LLC (Clients). Attorney has been representing Clients since April 2014. Clients cannot afford to pay Attorney. Clients and Attorney have agreed that in lieu of financial compensation Attorney will receive a [sic] 15% of the equity of Signature Emergency Products LLC. Attorney may demand conveyance of the 15% equity at any time. It is agreed that the 15% equity in Signature Emergency Products LLC will compensate [A]ttorney for Legal Services rendered to Clients through September 10, 2014. This agreement supplements the prior agreement wherein Clients agreed to pay [A]ttorney $60,000 for her services through June 30, 2014.

Fieger and Hall—again, in his individual capacity and on behalf of SEP and SML—signed the agreement.

Three months later, Fieger negotiated a confidential settlement that resolved Freedom Medical's RICO claims against Hall, SEP, and SML. With that case behind him, Hall "was able to continue the operation of SEP and turn [it] into a highly profitable" biomedical equipment business. Fieger continued to represent Hall and the companies as clients, litigating various matters on their behalf in the ensuing years. After those cases concluded, Fieger, Hall, and the companies entered into a third fee agreement on July 3, 2017 (the "July 2017 Fee Agreement").

The document—titled "Fee Agreement Update and Acknowledgement"—states:

> Since the time of the settlement of the RICO litigation in the fall of 2014, Sharon Cherry has continued to represent Clifford Hall, Signature Medical Ltd and Signature Emergency Products (SEP) (clients) in various matters. Those matters include the SBA matter, the Citizens Bank case against Signature Medical Ltd (SML) and in the matter of *Ashby v. Hall* in connection with Ashby's case against Hall, SEP and SML for unpaid fees relating to the Citizens Bank representation. The latter representation by Sharon Cherry in the *Ashby v. Hall* case resulted in representation at an arbitration and then later in a one-day trial before Judge Green. Sharon Cherry did not charge any additional fees for the foregoing legal representation. To date clients have paid Sharon Cherry $33,500 towards the $60,000 fee. Sharon Cherry has not demanded payment in full on the remaining fees in order to allow SEP to thrive. Clients will pay the remaining balance over the next 24 months. Hall will transfer the 15% interest in SEP to Sharon Cherry upon demand by Sharon Cherry. Sharon Cherry has agreed not to charge Hall any additional fees for the legal representation provided in the Citizen's Bank case and the *Ashby v. Hall* case.

On the second page of that agreement, the Fieger and Hall signed an acknowledgement that:

"CLIFFORD HALL WAS ADVISED OF THE RIGHT TO SEEK INDEPENDENT COUNSEL WITH HIS AGREEMENT TO TRANSFER A 15% INTEREST IN SIGNATURE EMERGENCY PRODUCTS TO ATTORNEY SHARON [FIEGER] FOR LEGAL SERVICES RENDERED THROUGH 9/3/14." Immediately below their signatures on that page, there is an unsigned handwritten note, the author of which is unclear from the face of the Second Amended Complaint. But given that this is a Motion to Dismiss, the Court will read the note in the light most favorable to Fieger (*i.e.*, that the handwriting is Hall's). *See Fowler*, 578 F.3d at 210. It reads:

> I have been very satisfied with the service that Sharon Cherry has provided the Companies and myself, and I am grateful to have her as my attorney for all she has done and will continue to do in the future. It is a pleasure to work with someone that is devoted to her clients with such detail and passion.

In the years that followed, Hall continued to operate SEP as its sole owner and chip away at the outstanding sum he owed Fieger pursuant to the First Fee Agreement. Then, at some point

in 2020, he notified Fieger that he had conveyed to two individuals—Gillespie and Philip Frayne—a 49% ownership interest in the company. Alarmed about the status of her 15% equity interest, Fieger asked Hall from where her share would be sourced under that new structure. He promptly reassured her that "[i]t will come from my 51% interest."

By August 2023, Hall's obligations under the First Fee Agreement were nearly satisfied. Recognizing this, Fieger contacted him later that month and requested that he make a final payment. She arranged to meet him at his office on September 5, 2023. When she arrived that day, Hall handed her a check and said: "I guess we are done." Flabbergasted, Fieger responded: "What about my 15% interest in SEP?" Hall proceeded to disavow any memory of that agreement and repeatedly insisted that he only owed her $60,000. The next day, Fieger forwarded Hall pictures of the July 2017 Fee Agreement. He wrote back:

> Hi Sharon, we are still looking at this info. Tom [Gillespie] is on board with the situation I got all the documents in order so I should have a conversation with Tom first of the week now. Once I know everything is good I will call you and give you what we have come up with. As far as it looks right now we are looking at the numbers on the company. Sorry for the delay but we want to make sure everything is correct.

But Hall never followed up with a plan. So, in an effort to resolve the impasse, Fieger, Hall, and Gillespie participated in a mediation in January 2024. When mediation faltered, Fieger initiated the above-captioned action seeking approximately $600,000—the value she attributes to her alleged equity interest in SEP.

## II. DISCUSSION

### A. Motions to Strike

At the outset, Hall and SEP each move to strike, pursuant to Rule 12(f), certain factual allegations recited in the Second Amended Complaint. Specifically, they maintain that the following paragraphs are "impertinent and immaterial" and/or "improperly disclose[d] material

protected by attorney-client confidentiality and the attorney-client privilege":

- Paragraphs 20-35, which pertain to Hall's involvement in a separate criminal matter in state court regarding the operation of SEP;

- Paragraph 63, which recounts a meeting between Hall, Fieger, and SEP's accountant "to discuss the possibility of SEP filing for bankruptcy";

- Paragraph 77, which outlines a discussion between Hall and Fieger about "the possibility of instituting a malicious prosecution case against Freedom Medical";

- Paragraph 80, which details Hall's initial position regarding a settlement with Freedom Medical to resolve the RICO claims;

- Paragraphs 105 and 106, which explain Fieger's representation of Hall in a matter brought by Citizens Bank that ultimately ended in a settlement; and,

- Paragraphs 123 and 24, which describe Hall's idea of providing an ownership interest in SEP to Gillespie and Frayne.

Rule 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *McInerney v. Moyer Lumber & Hardware*, 244 F. Supp.2d 393, 402 (E.D. Pa. 2002); *Dann v. Lincoln Nat'l Corp.*, 274 F.R.D. 139, 143 (E.D. Pa. 2011) (explaining that "Rule 12(f) is not meant to afford an opportunity to determine disputed and substantial questions of law" (citations and internal quotation marks omitted)). Courts possess "considerable discretion" in disposing of such motions. *Adams v. Cnty. of Erie*, 2009 WL 4016636 at *1 (W.D. Pa. Nov. 19, 2009). That said, they are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." *Natale v. Winthrop Res. Corp.*, 2008 WL 2758238, at *14 (E. D. Pa. July 9, 2008) (citation omitted); *see also Kaetz v. Wolfson*, 2022 WL 4115505, at *1 n.2 (3d Cir. Sep. 9, 2022), *cert. dismissed*, 143

S. Ct. 1012 (2023), *reconsideration denied*, 143 S. Ct. 1744 (2023). Striking some or all of a pleading is therefore considered "a drastic remedy to be resorted to only when required for the purposes of justice and should be used sparingly." *DeLa Cruz v. Piccari Press*, 521 F. Supp.2d 424, 428 (E.D. Pa. 2007) (citation and internal quotation marks omitted).

Hall and SEP have not met that high burden. First, they have provided no citations to support their request to strike Paragraphs 63, 77, 80, 105-06, and 123-24 on the grounds that they "improperly disclose material protected by attorney-client confidentiality and the attorney-client privilege" despite the requirement of Rule 7.1 of the Local Rules of Civil Procedure of the Eastern District of Pennsylvania that "[e]very motion not certified as uncontested, or not governed by Local Civil Rule 26.1(g), shall be accompanied by a brief containing *a concise statement of the legal contentions and authorities relied upon in support of the motion*." E.D. Pa. R. Civ. P. 7.1(c) (emphasis added). Their argument regarding the purportedly "impertinent" references to Hall's involvement in a separate criminal matter, which are set forth in Paragraphs 20-35, suffers from this same error. "Courts in this District have consistently held the failure to cite any applicable law is sufficient to deny a motion as without merit because zeal and advocacy is never an appropriate substitute for case law and statutory authority in dealings with the Court." *Anthony v. Small Tube Mfg. Corp.*, 535 F. Supp.2d 506, 511 n.8 (E.D. Pa. 2007) (citations and internal quotation marks omitted). Thus, because those arguments consist of "no more than . . . conclusory assertion[s]," they shall be "deemed waived." *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997).

What remains, then, is Hall and SEP's contention about the allegations set forth in Paragraphs 80, 105, 106 concerning confidential settlement discussions in other matters, which, in their view, would render them inadmissible at trial. The argument that they should be stricken

finds its genesis in Federal Rule of Evidence 408.  *See, e.g.*, *Providence Town Ctr. LP v. Raymours Furniture Co.*, 2009 WL 3821935, at *5 (E.D. Pa. Nov. 13, 2009) (collecting cases).  However, Rule 408 is a rule of evidence, which "does not govern pleadings."  *See, e.g.*, *Righteous v. Overbrook Sch. for the Blind*, 2023 WL 4763994, at *12 (E.D. Pa. July 26, 2023); *Kaisen v. TD Bank, N.A.*, 2019 WL 532296, at *5 (E.D. Pa. Feb. 11, 2019); *BTG Int'l Inc. v. Bioactive Labs.*, 2016 WL 3519712, at *11 (E.D. Pa. June 28, 2016); *Goldstein v. Elk Lighting, Inc.*, 2013 WL 790765, at *9 (M.D. Pa. Mar. 4, 2013); *Steak Umm Co. v. Steak 'Em Up, Inc.*, 2009 WL 3540786, at *3 (E.D. Pa. Oct. 29, 2009); *McAndrews L. Offs. v. Sch. Dist. of Philadelphia*, 2007 WL 515412, at *3 (E.D. Pa. Feb. 9, 2007).  Therefore, their argument is premature.

Accordingly, because Hall and SEP have failed to establish that the challenged paragraphs are "redundant, immaterial, impertinent, or scandalous," their Motions to Strike shall be denied.

> **B.** **Motions to Dismiss**
>> **i.** ***Legal Standard***

Turning now to Hall and SEP's Motions to Dismiss.  To survive motions brought pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.  When analyzing a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the

complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id*. at 210-11 (citation omitted). In so doing, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

### ii. Service of Process

First, Hall contends that service of the Original Complaint was improper under Federal Rule of Civil Procedure 4(c)(2), which provides that "[a]ny person who is at least 18 years old and not a party may serve a summons and complaint." Fed. R. Civ. P. 4(c)(2). He maintains that Fieger violated that provision because he was served by her husband. Although Hall concedes that Fieger's husband is indeed over 18 years old and is not a party to this case, he submits that "the plain intent of Rule 4(c)(2) is to prevent individuals interested in the outcome of a case," like her husband, "from serving process in that case." Alternatively, Hall asserts that "Fieger's [F]irst Amended Complaint, which asserted new claims for relief against [him], was never properly served." If service is deemed improper, the Court must exercise its "broad discretion to either dismiss the plaintiff's complaint for failure to effect service or to simply quash service of process." *Umbenhauer v. Woog*, 969 F.2d 25, 30 (3d Cir. 1992).

The Court need not address those arguments, however, as they are aimed at two superseded pleadings. It is the Second Amended Complaint, not the Original Complaint nor the First Amended Complaint, which is the operative pleading in this matter, *see W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013) (explaining that an amended complaint "supersedes the original and renders it of no legal effect"), so because

Hall does not in any way dispute the service of that document, his Motion to Dismiss shall be denied in this respect.

### iii.    Statute of Limitations

Next, Hall and SEP move to dismiss Fieger's claims on the ground that all the applicable statutes of limitations have run.  Although the Federal Rules of Civil Procedure require that affirmative defenses be pleaded in the Answer, in the Third Circuit, a statute of limitations argument may warrant dismissal of a claim at the pleading stage "if the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations."  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citation and internal quotation marks omitted).  But if the expiration of the limitation period "is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Id*.

Federal courts adjudicating state law claims apply the forum state's statute of limitations. *See Stephens v. Clash*, 796 F.3d 281, 289 (3d Cir. 2015).  To that end, Pennsylvania law provides for the following statutes of limitations: two years after the claim accrues for claims sounding in fraud, *see* 42 Pa. C.S. § 5524(7); and, four years after the claim accrues for claims sounding in breach of a written contract, promissory estoppel, and other equitable relief stemming from contractual disputes, *see* 42 Pa. C.S. § 5525(a)(8); *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000) ("As promissory estoppel is invoked in order to avoid injustice, it permits an equitable remedy to a contract dispute.  Thus, . . . like other contract actions, the statute of limitations for a cause of action in promissory estoppel is governed by § 5525.").

Under Pennsylvania law, "a cause of action in contract accrues at the time of breach,"[5]

---

[5] Citing *Gurenlian v. Gurenlian,* 595 A.2d 145, 150 (Pa. Super. 1991) and *Cook v. Carpenter*, 61 A. 799, 803 (Pa. 1905), Hall and SEP submit that where contracts writ large are "repayable on demand," like the September 2014 and

*Colonial Assur. Co. v. Mercantile & Gen. Reinsur. Co.*, 297 F. Supp.2d 764, 769-70 (E.D. Pa. 2003), *aff'd*, 130 F. App'x 607 (3d Cir. 2005), while a claim for fraud "accrues when the injury is suffered." *Dongelewicz v. First E. Bank*, 80 F. Supp.2d 339, 345 (M.D. Pa. 1999), *aff'd sub nom.*, *Dongelewicz v. PNC Bank Nat'l. Ass'n.*, 104 F. App'x 811 (3d Cir. 2004). Pennsylvania's so-called "discovery rule" provides a narrow exception to that framework. To that end, when an injury is latent or "the causal connection between an injury and another's conduct is not apparent," the discovery rule "may operate to toll the statute of limitations until the plaintiff discovers, or reasonably should discover, that she has been injured and that her injury has been caused by another party's conduct." *Wilson v. El-Daief*, 964 A.2d 354, 361-62 (Pa. 2009). "Mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005). Rather, "the finder of fact focuses on whether the plaintiff was reasonably diligent in discovering his injury." *Crouse*, 745 A.2d at 611. That inquiry "ultimately boils down to 'not, what did the plaintiff know of the injury done him? [B]ut, what might he have known, by the use of the means of information within his reach, with the vigilance the law requires of him?'" *Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp.3d 115, 126 (E.D. Pa. 2019) (quoting *Fine*, 870 A.2d at 857).

Here, generously construing the Second Amended Complaint, Fieger alleges that Hall breached the September 2014 and July 2017 Fee Agreements on September 5, 2023 when he spurned her first demand to convey the 15% equity interest in SEP. It is apparent from the face

---

July 2017 Fee Agreements, any cause of action relating to the repayment of those contracts accrues immediately upon the lending of money, as payment could be requested at any time. But those cases say no such thing. Rather, *Gurenlian* and *Carpenter* pertain to the accrual of claims arising out of a party's failure to repay two specific types of loan instruments: promissory and demand notes. *See Equip. Fin., LLC v. Hutchison*, 487 F. App'x 25, 29 n.15 (3d Cir. 2012) (interpreting *Gurenlian* and recognizing that the statute of limitation analysis differs depending on the type of agreement at issue). And Hall and SEP do not explain why the holdings of those two cases, which arose in the context of agreements for the lending of money, should govern this case, which is distinguishable in that it involves an agreement for the payment of services rendered.

of the Second Amended Complaint, therefore, that her causes of action for breach of contract, promissory estoppel, and equitable relief accrued on September 5, 2023. *See Colonial Assur. Co.*, 297 F. Supp.2d at 769-70. It follows that she had four years—until September 5, 2027—to bring those claims. *See* 42 Pa. C.S. § 5525(a)(8); *Crouse*, 745 A.2d at 610. Her Original Complaint, which only contained a breach of contract claim, was filed on June 4, 2024. Her First Amended Complaint, which repleaded that cause of action along with additional claims for fraud, promissory estoppel, and equitable relief, was filed on February 5, 2025. Her Second Amended Complaint, which supplemented those four claims with additional factual allegations, was filed on May 12, 2025. Accordingly, all of Fieger's contract-related claims were brought within the four-year statute of limitations, meaning that Hall and SEP's Motions to Dismiss shall be denied with respect to them.[6]

Turning next to Fieger's fraud claim, the Second Amended Complaint, liberally construed, alleges that Hall fraudulently misrepresented to her that "he had the authority to act on behalf of SEP"—and did not need Gillespie or Frayne's approval— when he signed the September 2014 and July 2017 Fee Agreements. Alternatively, to the extent he did not have the requisite authority, she alleges that he fraudulently induced her to enter into those agreements so that she would continue to represent him and the companies. Those agreements were signed on September 3, 2014 and July 3, 2017 respectively. So, pursuant to 42 Pa. C.S. § 5524(7), Fieger had two years—until September 3, 2016 and July 3, 2019—to bring a fraud claim arising out of the execution of either document.

---

[6] Because none of those claims are time-barred, there is no need to consider whether the relation back doctrine cures any defects. *See* Fed. R. Civ. P. 15(c); *Wirt v. Bon-Ton Stores, Inc.*, 134 F. Supp.3d 852, 859 (M.D. Pa. 2015) (explaining that a claim brought in an amended complaint that falls outside the applicable statute of limitations "would be time-barred unless saved by the relation back doctrine"); *Garvin v. City of Philadelphia*, 354 F.3d 215, 220 (3d Cir. 2003) ("If the amendment relates back to the date of the filing of the original complaint, the amended complaint is treated, for statute of limitations purposes, as if it had been filed at that time.").

As explained above, Fieger waited until February 5, 2025—the date on which she filed the First Amended Complaint—to raise any cause of action sounding in fraud.  At first blush, such a delay would serve to time-bar Fieger's claim.  Invoking the discovery rule, however, Fieger argues that the statute of limitations should be tolled until January 23, 2025.  She maintains that she first discovered her injury on that date during the Preliminary Pretrial Conference between the parties and the Court, *see* Fed. R. Civ. P. 16, at which conference Hall, who at that point was proceeding *pro se*, denied ever telling her that he was the sole owner of SEP.  Up until that point, she avers that she relied on Hall's representation from one of their initial meetings in 2014 that Gillespie had relinquished his interest in SEP, leaving Hall as the sole owner of the company.  It was not until 2020, several years after they signed the September 2014 and July 2017 Fee Agreements, that Hall informed her that he had conveyed a 49% ownership interest in SEP to Gillespie and Frayne.

In response, Hall and SEP assert that the discovery rule should not apply to Fieger's complained-of injury, as "any reasonable mind would conclude that Ms. Fieger (an experienced attorney) did not exercise reasonable diligence when she failed to ascertain Mr. Hall's authority to execute the Fee Agreements on behalf of SEP."  That dereliction is especially evident, they argue, since even a cursory "review of SEP's corporate documents would have revealed the scope of Mr. Hall's authority before Mr. Hall even executed the Fee Agreements."

Against that backdrop, resolving the issue of whether Fieger exercised reasonable diligence—and more broadly, whether her fraud claim is time-barred—is not appropriate at this stage.  That is because it is well-settled under Pennsylvania law that "only where the facts are so clear that reasonable minds *cannot differ* may the commencement of the limitations period be determined as a matter of law."  *Crouse*, 745 A.2d at 611 (emphasis in original).  Where there

are disputed issues of fact, as is the case here, "the point at which the complaining party should reasonably be aware that he has suffered an injury is a[n] . . . issue best determined by the collective judgment, wisdom and experience of jurors." *Id.* (citation and internal quotation marks omitted); *see also Wilson*, 964 A.2d at 362 (explaining that the "determination concerning the plaintiff's awareness of the injury and its cause is fact intensive, and therefore, ordinarily is a question for a jury to decide"). Accordingly, Hall and SEP's Motions to Dismiss shall be denied in this respect as well. *See, e.g.*, *Marcum*, 423 F. Supp.3d at 127 ("While Plaintiffs may have seen the damage in 2016 and theorized as its cause, a plausible reading of the allegations in the Complaint is that they did not know what caused it such that they could bring a lawsuit earlier than they did. Thus, 'the ordinary rule should apply that factual issues pertaining to the plaintiff's notice and diligence are for the jury.'" (quoting *Wilson*, 964 A.2d at 365)); *Schmidt*, 770 F.3d at 249.

### iv.    *Enforceability of the Fee Agreements*

Finally, Hall and SEP contend that the Second Amended Complaint must be dismissed because the claims are all predicated upon the September 2014 and July 2017 Fee Agreements, which, in their view, are unenforceable as unconscionable and against public policy in that they violate Fieger's obligations as an attorney under the Pennsylvania Rules of Professional Conduct.

Unconscionability is a "defensive contractual remedy which serves to relieve a party from an unfair contract or from an unfair portion of a contract." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999) (citing *Germantown Mfg. Co. v. Rawlinson*, 491 A.2d 138, 145 (Pa. Super. 1985)). "To prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable." *Quilloin v. Tenet HealthSystem Philadelphia, Inc.*, 673 F.3d 221, 230 (3d Cir. 2012) (citing *Salley v. Option*

*One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007)).  Procedural unconscionability, on one hand, occurs where "there was a lack of meaningful choice in the acceptance of the challenged provision," *Salley*, 925 A.2d at 119, or where the contract was formed through "oppression and unfair surprise," *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1228 n.16 (Pa. 1981).  Substantive unconscionability, on the other hand, "refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Harris*, 183 F.3d at 181 (citation omitted).  The party challenging a contract provision as unconscionable generally bears the burden of proving as much.  *See Bishop v. Washington*, 480 A.2d 1088, 1094 (Pa. Super. 1984).

Moreover, a "contract term or condition that violates public policy is void and is thus unenforceable." *Pryor v. Nat'l Collegiate Athletic Ass'n.*, 288 F.3d 548, 569 (3d Cir. 2002).  The Pennsylvania Supreme Court has explained that public policy is to be primarily ascertained "by reference to the laws and legal precedents," and "not from general considerations of supposed public interest."  *Rush v. Erie Ins. Exch.*, 308 A.3d 780, 796 (Pa. 2024) (citation omitted).  Nonetheless, "long governmental practice[s], and "obvious ethical or moral standards" can be instructive.  *Eichelman v. Nationwide Ins. Co.*, 711 A.2d 1006, 1008 (Pa. 1998) (citation omitted); *see also Rush*, 308 A.3d at 809 (Wecht. J., concurring).  As with unconscionability, the burden is on the challenger to demonstrate that certain provisions are unenforceable for reasons of public policy—a burden that has been characterized as "heavy."  *Sayles v. Allstate Ins. Co.*, 219 A.3d 1110, 1122-23 (Pa. 2019).

Here, Hall and SEP argue that "the Fee Agreements purporting to grant her a 15% interest violate the Pennsylvania Rules of Professional Conduct and common law rules governing the attorney-client relationship."  First, they assert that demanding that a 15% equity

interest, which Fieger alleges is worth approximately $600,000, offends Rule 1.5's requirement that "[a] lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee." Pa. R. Prof. C. 1.5(a). Such a fee is "clearly excessive," submit Hall and SEP, because "generously assuming that Ms. Fieger worked 10 billable hours per weekday and worked solely on the SEP Matter" during the course of her representation, "her implied hourly rate would be nearly $1,200/hour"—an amount that would "defy logic" and "clearly exceed the bounds of reasonable attorneys' fees."

They also contend that the September 2014 and July 2017 Fee Agreements run afoul of Rule 1.8, which states, in relevant part:

> (a)  A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
>> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
>>
>> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
>>
>> (3) the client gives informed consent in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

Pa. R. Prof. C. 1.8(a); *see also Lynch v. Hook*, 444 A.2d 157, 159 (Pa. Super. 1982) ("It is well-settled that transactions between attorneys and clients will be sustained only when good faith and fair disclosures attend such transactions."). According to Hall and SEP, Fieger "failed to advise her clients in writing of the desirability of seeking independent counsel," which left them unable to provide informed consent regarding the equity transfer provision.

However, Hall and SEP's arguments are unavailing at this stage since they are

affirmative defenses that hinge on "issue[s] of fact not properly resolved on a motion to dismiss." *Zaftr Inc. v. Kirk*, 760 F. Supp.3d 275, 285 (E.D. Pa. 2024) (citation omitted) (alteration in original); *G & F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp.3d 583, 594 (D.N.J. 2014) ("The unconscionability inquiry is fact-intensive and therefore more appropriately explored at summary judgment . . . ."). Take their argument regarding Rule 1.5. Although the Second Amended Complaint discusses Fieger's representation of Hall and SEP in broad strokes, there is, by way of example only, a dearth of information regarding the exact number of hours she devoted to their matters. Without that figure, deciding whether the asserted fee is excessive, and therefore potentially unenforceable, is entirely premature.

That same reasoning applies to their contention regarding Rule 1.8 about the lack of notice and informed consent, which argument Fieger vehemently disputes. To that end, she maintains that it is clear from the plain text of the July 2017 Fee Agreement, which is appended to the Second Amended Complaint, that she explicitly advised Hall of his right to seek independent counsel. Specifically, she points to the second page of that agreement, which all parties signed, providing: "CLIFFORD HALL WAS ADVISED OF THE RIGHT TO SEEK INDEPENDENT COUNSEL WITH HIS AGREEMENT TO TRANSFER A 15% INTEREST IN SIGNATURE EMERGENCY PRODUCTS TO ATTORNEY SHARON [FIEGER] FOR LEGAL SERVICES RENDERED THROUGH 9/3/14." And immediately below that alleged acknowledgement, there is an unsigned handwritten note—the author of which is unclear—that reads:

> I have been very satisfied with the service that Sharon Cherry has provided the Companies and myself, and I am grateful to have her as my attorney for all she has done and will continue to do in the future. It is a pleasure to work with someone that is devoted to her clients with such detail and passion.

Hall and SEP rightly point out that nowhere in the Second Amended Complaint, or any of

the documents attached thereto, does Fieger allege that she provided that same type of notice in the September 2014 Fee Agreement.  But, putting aside the question of whether the inclusion of the notice and informed consent provision in the July 2017 Fee Agreement cured any ethical defects in the September 2014 Fee Agreement, Hall and SEP's argument works against them, as it fundamentally depends on facts that are not "apparent on the face of the complaint." *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997).  Accordingly, Hall and SEP's Motions to Dismiss shall be denied in this respect.

As a final gamble, Hall and SEP assert that the September 2014 and July 2017 Fee Agreements are unenforceable because they "provide[] no information regarding the mechanics of the transfer, the nature of the equity interest, or any rights conveyed."  For instance, they contend that "[i]t is unclear whether Ms. Fieger claims an ownership interest, voting rights, profit-sharing interest, or some other interest in SEP."  Though couched in the language of unenforceability, their argument is, in essence, about the ambiguity of the equity transfer provisions.  *Cf. Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993) ("A contract will be found to be ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning.").  And because it is well-settled that "[w]aving languidly in the direction of an argument is not making one," it shall be deemed waived.  *Magalengo v. Pa. Interscholastic Athl. Ass'n*, 2025 WL 2200916, at *12 n.5 (E.D. Pa. August 1, 2025); *see also John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing . . . but not squarely argued, are considered waived." (citing *Pa. Dep't of Pub. Welfare v. U.S. Dep't of Health & Human Servs.*, 101 F.3d 939, 945 (3d Cir. 1996))).

### III. CONCLUSION

For the foregoing reasons, Hall and SEP's Motions to Strike Certain Factual Allegations and to Dismiss the Second Amended Complaint shall be denied.

An appropriate order follows.

                                               **BY THE COURT:**

                                               /s/ Wendy Beetlestone

                                               **WENDY BEETLESTONE, C.J.**